WALTER LIDDLE, JR., RESPONDENT, v. GUY A. THOMPSON, TRUSTEE, MISSOURI PACIFIC RAILROAD COMPANY, DEBTOR, APPELLANT.— 162 S. W. (2d) 614.

Kansas City Court of Appeals. May 25, 1942.

*Leslie A. Welch* and *Richard H. Beeson* for appellant.

*Burrus & Burrus* and *Mosman, Rogers & Bell* for respondent.

BOYER, C.—Plaintiff sustained personal injuries and sued for damages on account of the alleged negligence of defendant in the construction and maintenance of a railroad grade crossing said to have been defective at the time of injury. Verdict and judgment were for the plaintiff and the defendant has duly appealed. The errors assigned and covered by the brief for consideration are (1) that the demurrer to the evidence should have been sustained; (2) that plaintiff was negligent as a matter of law; and (3) that plaintiff's instructions 1 and 2 were erroneous.

The petition states that on the 7th day of October, 1940, while plaintiff was driving his automobile upon a public highway in Jackson County known as the Courtney-Atherton road, and at a point where said road crosses the railroad tracks, he was caused to lose control of his automobile while driving over said crossing on account of the negligent maintenance of the crossing, and as a result thereof plaintiff's automobile was overturned and plaintiff injured. The negligence upon which recovery is sought is further stated as follows:

"Plaintiff further states that it was the duty of the defendant herein to so lay its tracks and so keep and maintain the same across said highway that the crossing thereof would be at all times safe for the traveling public, but plaintiff states that defendant, solely unmindful of its duty as aforsaid, failed and neglected to contract and maintain a good and sufficient crossing at the point aforesaid, in that the crossing planks next to and between the rails of said track were

uneven and burned, and set so as to not be at right angles with the said road right-of-way, but were so placed as to make the crossing of said tracks confined to a narrower path than the width of each of the planks. That the defendant had permitted the gravel between the said planks and rails of said crossing to be displaced so as to leave the edges of the planks and rails of said tracks protruding above the surface of the gravel between the said rails and planks of said railroad. That there are two sets of tracks in close proximity to each other, and were so placed as to permit the east track to be at a lower level than the west track, and thereby caused said tracks to be made unsafe for a crossing by motor vehicles by the improper placing of said planks and by permitting them to remain in said burned and uneven condition as aforesaid, and that said condition was dangerous and likely to cause the driver of a motor vehicle, while using due care, to lose control of the vehicle. That there were no adequate crossing signs so placed as to warn a driver of the existence of said crossing, or of the existence of the hazards or dangers thereat.''

The answer was a general denial and a plea of contributory negligence. The reply was a general denial.

The statement of the evidence will be made in view of the assigned errors. The physical conditions of the highway and of the railroad crossing were best shown by the testimony of a county highway engineer who made observations and measurements about two weeks after the date of the accident, and by a drawing prepared by him supplemented by numerous photographs that were taken at the same time. The crossing is over double tracks of the railroad. The highway at that point extends almost due east and west, the railroad tracks crossing it in a somewhat northwest and southeast direction forming an acute angle of about thirty degrees. The county highway was an oiled dirt road with an average width of from eighteen to twenty feet of oiled surface except where it approached the railroad crossing. The county maintained the highway, and oiled the surface thereof up to the planks of the crossing on each side thereof. This had been done for a period of about nine years. Approaching the crossing from the west the public road is on a slightly descending grade and emerges from a curve, crosses a bridge over a ravine 225 feet from the railroad crossing, and thereafter continues at a slightly downward grade. At the immediate approach to the crossing the oiled surface of the public road gradually narrows to a width of 11.3 feet where it joins the timbers of the crossing on the west side, and to a width of 12.1 feet at the juncture on the east side. The total length of the crossing over both tracks of the railroad is 23.6 feet. The railroad crossing proper was constructed of planks twenty feet in length, ten inches in width, and four inches in thickness; two of said planks being laid on the outside of the outside rail of each track. The same kind of

planks cover all the space between the rails of each track. The space between the two tracks is covered by two planks on each side of the rails and one plank across the ends of said space, and the intervening space is covered with gravel and cinders. The exact width between the two tracks is not shown, but it appears to be about as narrow as practical operation would permit. The graveled surface between the tracks is comparatively smooth and flush with the timbers enclosing it except at the extreme south end thereof where the gravel or cinders have been thrown away to a depth of about three inches at two points near the extreme south end of the gravel. The south end of some of the planks laid between the rails of the east track had been burned off to the extent of about six or eight inches and burned to some extent between three of the planks, leaving intervening spaces at the south end tapering gradually inward for distances varying from one foot to about three and one-half feet. Other defects within the space of the crossing proper were limited to undefined depressions and inequalities in the surface. It was shown that the east railroad track was slightly lower than the other, but from the pictures and the testimony the entire crossing appears to be practically level, with a slight incline from the west track to the east track. On the west side of the crossing the surface of the public road slopes gradually from the middle and used portion thereof toward each end of the outside plank a maximum depth of five inches at the end of the plank; that is, the surface of the plank at the end is five inches above the outside surface, leaving 4.7 feet of the south end of the plank and four feet of the north end partly exposed. A similar condition exists on the east side of the crossing with some variation in the total length of the outside plank that is exposed above the earth. A drawing made by the engineer and a number of photographs offered in evidence and marked as exhibits, by permission, have been filed with the case for consideration; they are not printed in the abstract. The photographs clearly show physical conditions of the crossing and, with the testimony, the distances from which the railroad tracks and the crossing would be visible to one approaching from the west. One of said photographs was taken at a distance of 138 feet from the crossing; another shows a view of the tracks and of the crossing from the bridge across the ravine 225 feet away.

On the date of the accident plaintiff and five companions, two girls and three boys, all of whom were attending high school at Independence, during the noon recess, decided to take one of the boys to his home near Atherton, a distance of about eleven miles, because the boy had broken a finger and was ill. Plaintiff had a 1930 model A Ford coupe, and the injured boy had a Chevrolet roadster. Plaintiff, another boy, and a girl got in his car and the other three got in the Chevrolet and led the way on the journey for some distance until they came to a road called a cut-off which they decided to take to their

destination. At that point plaintiff drove his car around the other and took the lead; one of his companions had been over the road and knew the way. They proceeded eastwardly.

Plaintiff testified that he had never been on the road before, and he did not know that it crossed the railroad tracks; that he did not see any crossing sign and was not aware of a crossing until he was within twenty or thirty feet from it; that when he was about midway between the bridge and the crossing he noticed a truck approaching which he estimated to be about a city block on the other side of the crossing; that he then drew off to the right-hand side of the road because of the approach of the truck; and at the time he reached the crossing his car was to the south side of the main traveled portion of the road, and, not having seen the crossing until within twenty or thirty feet of it, the right front wheel of his car struck the plank on the west side of the crossing about one and one-half to two feet from the south end; that immediately thereafter his car was thrown to the left or to the north side and bumped and bounced over the crossing, first to one side and then the other, in the course of which he lost complete control of the car; that it ran about 100 feet beyond the crossing into a fence and turned over; that his car went across the road about 100 feet in front of the truck. Plaintiff testified that he approached the crossing at a rate of about twenty-five or thirty miles per hour; that he did not slacken speed. In describing what occurred when he hit the railroad crossing, he said: ''It threw me out of control. It seemed like the front end made, hit a bump, and down, and then it dropped down, and after that I was fighting to get control of the car—it threw the car completely out of my control.'' . . . ''It seemed like when I went on to it until my front wheels got to the middle of the second crossing, it was all bouncing, jolts and bumps.'' . . . ''It just threw me up, my foot off the pedals, and I tried to grab for the steering wheel, but the car was swerving and it went over to the left-hand side of the road and turned over.'' The car had gone through a fence on the north side of the road, knocked over two posts, and turned over when it hit the third. The actual distance by measurement from the crossing to this point was 130 feet. Plaintiff said the posts were loose, and on cross-examination he testified that the left front wheel of his car hit the plank first, but that he did not know at the time what wheel hit first; that his car was thrown to the left, was shot over to the north and that other bumps would throw it over to the left; that he could not say what bumps; that he did not know the tracks were there until he was within twenty or thirty fee of them, and then there was no time to look. Relative to the position of the truck while plaintiff was driving over the crossing until the time he overturned, plaintiff said: ''The truck was, I think, a block from the crossing when I hit the crossing; when my car went over, swerved and overturned, why, it went right across the front of the truck. That

would leave the truck, I would say, about 100 or 150 feet from me when I overturned.'' Plaintiff described a block as meaning an ordinary city block of 300 or 400 feet. The testimony shows that the distances given by plaintiff were estimates, and that he did not know how fast the truck was coming.

Other witnesses corroborated plaintiff's testimony in reference to his rate of speed and the manner in which his car struck the crossing, bounced and swerved across it, and finally skidded and overturned. The young lady riding with plaintiff was familiar with the road on which they were traveling and had been over the crossing many times before. She testified that she did not inform plaintiff that they were approaching a crossing and that it did not occur to her at that time to tell plaintiff to slow down; that she did not know then what caused the car to bounce and swerve from side to side, but found out later.

Three of the young people in the Chevrolet car were following plaintiff's car. A young lady was driving the Chevrolet, together with the injured boy and another boy. She testified that plaintiff's car was going over the crossing just after her car had crossed the bridge. The bridge mentioned was 225 feet from the crossing. She also testified that the approaching truck referred to by plaintiff passed her car going west while she was between the bridge and the crossing. Other testimony shows that the truck was occupied by two men, and that they did not stop. Their identity was never revealed by anything in the record. There was further evidence of the nature and extent of plaintiff's injuries.

Defendant offered only two exhibits, being photographs showing views of the crossing. One of such photographs was taken from the bridge west of the crossing and shows the presence of a crossing sign on the south side of the road adjacent to the railway. It was a winter scene and there was no foliage on the trees nearby. One of plaintiff's photographs taken from a position 138 feet west of the crossing on the 22d of October, shows trees and foliage on the south side of the road approaching the crossing, and no crossing sign is visible. Defendant offered no evidence on the issue of negligence of plaintiff or defendant, but stood upon the demurrer. Further mention of the state of the record will be made in the course of the opinion.

Was plaintiff guilty of negligence as a matter of law? Appellant calls attention to the fact that plaintiff was required to exercise the highest degree of care in the operation of his car and insists that in the exercise of such care plaintiff would have been able to see the railroad tracks for at least a distance of 138 feet; that the end of the plank with which plaintiff collided was plainly visible, and that it would be wholly unreasonable to permit a jury to find that plaintiff, while in the exercise of due care, drove his car in broad daylight off the oiled or traveled portion of the highway and permitted it to collide with anything as obvious as the end of the plank. The argument

proceeds on the assumption that it was the duty of plaintiff while approaching a railroad crossing to reduce speed, look out for approaching trains, and stop, if necessary, before reaching the zone of danger. Authorities cited by appellant to sustain this contention are the following: State ex rel. v. Hughes, 153 S. W. (2d) 53; Carruthers v. City of St. Louis, 111 S. W. (2d) 32; Blackburn v. City of St. Louis, 121 S. W. (2d) 727, 730.

The first case was one in which a collision had occurred between a truck and a train at a public crossing. Plaintiff obtained judgment for both actual and punitive damages and the sole issue presented by the appeal was whether the evidence was sufficient to warrant an award of punitive damages. The duty of the truck driver in approaching the crossing was defined in the course of the opinion to the effect that he was required to exercise the highest degree of care for his own safety under the statute, Section 8383, Revised Statutes 1939, and, in looking out for trains, if the view was obstructed so that he was unable to see whether he could pass in safety, he was required to exercise care commensurate with the circumstances. The other two cases were ruled against plaintiff on the ground that street obstructions of which complaint was made were erected and maintained in the exercise of the governmental function of the city. It is not apparent that there is anything ruled in these cases that controls the case in hand. Plaintiff did not collide with a train at a public crossing, but his claim rests upon the alleged defects either in construction or maintenance of the crossing itself. The question of plaintiff's negligence contributing to his injury, from certain points of view, may be said to be a close one for decision, and that it is at least doubtful whether plaintiff was in the exercise of due care. However, viewing the case from other angles and aspects, and in the light of the evidence most favorable to plaintiff and the inferences that may be drawn therefrom, it appears there is sufficient ground for reasonable minds to entertain different opinions upon the question of plaintiff's negligence. His rate of speed and conduct under all of the circumstances do not as a matter of law foreclose the submission of the question of contributory negligence to the jury. He was not familiar with the public road; it was apparently a good road; the rate of speed was not excessive; he had no knowledge of a railroad crossing that highway, and although he must be held to have seen what was plainly visible, there was no crossing sign in view. The photographs show that the railroad tracks at the crossing were visible for a distance of 138 feet if one were looking; but near this point or, as plaintiff says, about midway between the bridge and the crossing he observed an approaching truck and drew off to the right-hand side of the road while approaching the crossing. His attention was diverted primarily to the approaching vehicle and he did not actually see the crossing and the situation until he was very near to it. He was then in such

a position that it required only a second of time for his car to reach the plank with which he collided. He estimated that the approaching truck was still about a city block away. The speed at which it was approaching was unknown. The jolt received by the impact of the car with the structure of the crossing, and possibly other inequalities in the surface of the crossing, caused him to lose control. His car went over the crossing and to the north side of the road in front of the approaching truck and overturned. Under the circumstances, plaintiff was not bound by his estimate of distances. [Scott v. K. C. Public Service Co., 115 S. W. (2d) 518, 523.] If a conclusion contrary to that of plaintiff's negligence is fairly deducible from the evidence and all reasonable inferences, the issue is for the jury. [Lamb v. Mo. Pac. R. R. Co., 147 Mo. 171, 186.]

Appellant contends further that the demurrer should have been sustained because there was no evidence that defendant was negligent as charged since there was no evidence as to the original construction of the crossing, and there was no evidence of negligent maintenance because there was no proof of notice. In view of the charge of negligence set forth in the petition and the evidence shown by the record, it is found that this contention must be sustained. It is observed that the negligence charged is confined solely to certain alleged defects within the limits of the crossing proper. There is no plea that defendant knew of said defects or that they had existed for a sufficient length of time that would impute notice; nor is there any proof as to how long the alleged defects had existed or that defendant knew anything about them in time to have repaired the defects before the accident. The recovery instruction authorized the jury to find for plaintiff if it found from the evidence "that defendant was negligent in the construction or maintenance of the crossing in question." There was no evidence as to any negligence on the part of defendant in the original construction of the crossing. The statute, Section 5412, Revised Statutes 1939, specifies the manner and the minimum of material to be used in construction. The planks used in this case exceeded in thickness and length and afforded a wider crossing than that required. It has been noted that the statute fixes liability for negligent construction, but does not declare liability for failure to keep the crossing in repair. To recover for negligent maintenance of a crossing it must be alleged and proved that the defendant either had actual or constructive notice of the defect within time to make repairs before the time of an accident alleged to have been occasioned thereby. [Nixon v. Hannibal & St. Joseph Ry. Co., 141 Mo. 425.]

Instructions 1 and 2, submitting the case for plaintiff, are assailed for many reasons. They are in the following words:

"No. 1. The Court instructs the jury that under the law of this State, the duty was upon defendant as operator of the railroad to construct and maintain a good and sufficient crossing where the rail-

road crosses public roads which are open for the public, and the duty is also upon the defendant, as operator of the railroad, to exercise ordinary care to maintain such crossings in a reasonably safe condition for travel and traffic by members of the public using such crossings in the ordinary modes.

"In the construction and maintenance of such crossings, the law requires that on each side of each rail shall be laid and even spiked to the cross ties a plank of good, sound timber of not less than 10 inches in width, 3 inches in thickness, nor less than 16 feet in length; that the approach to such planks shall be covered with macadam or gravel, or other equally durable materials, and properly joined up to the planks required to be laid on the outside of each rail so as to make good and sufficient approaches thereto of equal width and easy grade. You are instructed that failure to so construct and maintain such crossings would be negligence.

"No. 2. The Court instructs the jury that if, under Instruction Number 1, you find from the evidence that the crossing mentioned in evidence was upon a public road open to the public, if so, and the railroad tracks of the Missouri Pacific Railroad Company, and if you find from the evidence that defendant was negligent in the construction or maintenance of the crossing in question, and if you further find from the evidence that such negligence, if any, directly caused plaintiff to lose control of his automobile, as he was driving over and across the crossing, if so, and directly caused plaintiff's said automobile to run into a fence and upset and injure him, if so, and if you further find from the evidence that plaintiff was at all times in question in the exercise of the highest degree of care for his own safety, then your verdict should be for the plaintiff and against the defendant."

It is unnecessary to discuss all of the criticism made of these instructions, but sufficient defects will be noted to show that the recovery instruction was erroneous, and prejudicial to defendant. The negligence alleged was specific. Instruction 1 is an abstract declaration. Instruction 2 authorizes a verdict upon the finding of negligence generally. It does not require any finding upon factual issues as a basis for the verdict. No facts are required to be found which would constitute negligence, and the jury was permitted to reach its conclusion upon its own notion of what negligent act or omission might be attributed to the defendant. The jury was permitted to rove mentally in reaching its conclusion. The recovery instruction is indefensible. [Stanich v. Western Union Tel. Co., 153 S. W. (2d) 54, 56; Gillioz v. State Highway Commission, 153 S. W. (2d) 18, 26; Lewis v. Illinois Central Railroad Co., 50 S. W. (2d) 122, 125; State ex rel. Grisham v. Allen, 124 S. W. (2d) 1080, 1082.]

There was no evidence of any negligence in reference to the original construction of the crossing. The instruction authorized a recovery upon a finding of negligence in the construction or in the mainte-

nance' of the crossing. As indicated above, there could be no recovery in this case for negligent maintenance. Strictly, there could be no recovery under the petition for negligent construction. The main obstruction in plaintiff's way was the outside plank on the west side of the crossing where the surface of the road was not flush with the plank. In considering this claimed defect the question naturally arises as to whether it was one of construction or one of maintenance, and what duty, if any, rested upon the defendant for any construction or maintenance immediately adjacent to the outside plank.

Appellant contends that there was no duty on its part to construct or maintain the approach of the highway to the crossing and that there could be no liability of defendant for any defect in the approach immediately adjacent to the crossing without an unreasonable and unwarranted judicial construction of the statute. The pertinent part of Section 5214, Revised Statutes 1939, after providing the manner of construction and material to be used, is the following:

"The space between the inside planks shall be filled with macadam or gravel or two-inch boards evenly with the top of the planks, and shall make good and sufficient approaches thereto of equal width therewith and of easy grade; the same shall be covered with macadam or gravel to the depth of not less than six inches and shall be substantially and properly joined up to the plank required to be laid on outside of each rail."

The quoted portion of the statute, is substantially the same form, first appeared in Laws 1885, page 87, as an amendment to Section 807, Revised Statutes 1879. The section thus amended contained this provision:

"On each side of each rail shall be laid a plank of not less than eight inches in width, and the remaining space between the rails shall be macadamized; on the outside of each rail there shall be a macadamized or gravel pavement of not less than six inches in depth and not less than four nor more than ten feet in width, to be determined by the road overseer, street commissioner, or overseer having such public road or street in charge; this pavement to be substantially and properly joined up to the plank provided to be laid on the outside of each rail."

With this historical background what was the legislative intent as expressed in the present form of the statute with reference to requiring a railroad company to construct or maintain macadam or gravel or other substance "substantially and properly joined up to the plank required to be laid on outside of each rail?" The word "approaches" is used in reference to the planks required to be laid inside of the rails, and with this in view appellant contends, in effect, that there is no obligation on the part of the company to construct or maintain any part of the public road adjoining the outside plank. It must be admitted that there is found here an awkward combination of words and phrases giving rise to some ambiguity of the real legis-

lative intent either to require or to relieve the company of the duty to construct and maintain anything immediately adjacent to the outside plank of the crossing. However, that portion of the statute now brought in question in substantially the same form has been construed by this court in the case of Crane v. K. C. Southern Ry. Co., 199 Mo. App. 448, to the effect that macadam or gravel or other like durable substance should be properly joined up to the plank required to be laid on the outside of each rail. The above construction was made in view of a retrial of the case then being considered and with a view of defining generally the duty of the railroad in the construction and maintenance of a crossing. No sufficient reason is apparent why a departure should be made from that ruling.

Previous to 1885, the statute not only required construction adjacent to the plank on the outside of each rail, but prescribed the depth and width thereof. By the change brought about by the amendment in 1885, and re-enacted continuously thereafter in substantially the same form, it appears that the lawmakers did not intend to entirely relieve a railroad company from all duty to construct or maintain anything on the outside of the outside plank as an approach thereto, but did intend that macadam or gravel or other equally durable materials should be laid to a depth of not less than six inches and substantially and properly joined up to the outside plank. There is no evidence in this case as to how the approach was originally constructed and joined with the outside plank, and there is no evidence as to when or under what authority the crossing was originally established.

Since 1913 the Public Service Commission has had exclusive jurisdiction over the establishment of grade crossings and has been authorized to determine and prescribe the manner and point of crossing and the terms of installation, operation, maintenance, apportionment of expenses and the use and protection of such crossing. [Sec. 5627, R. S. 1939.] If this crossing was established by authority of the Commission, it is likely that some order was made affecting the duties of the respective parties that would supplement the duties required under section 5214. While plaintiff has failed to establish a cause of action in this case and was not entitled to the verdict, still it is possible that he might, upon an amended pleading and additional proof, establish some liability. For that reason it appears that the interest of justice requires that the case should not be reversed outright, but that the judgment should be reversed and the case remanded. The Commissioner so recommends. *Sperry, C.,* concurs.

PER CURIAM:—The foregoing opinion of BOYER, C., is adopted as the opinion of the court. The judgment is reversed and the case remanded. All concur.